E. BONNIE CAGLIA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Caglia v. Commissioner
Docket No. 23961-87.
United States Tax Court
T.C. Memo 1989-143; 1989 Tax Ct. Memo LEXIS 147; 57 T.C.M. (CCH) 1; T.C.M. (RIA) 89143; April 3, 1989. George F. Belyea and James I. Shepard, for the petitioner. Catherine L. Lau and Marion T. Robus, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined the following income tax deficiencies and additions to tax for petitioner: Additions to Tax, Sections
Year
Deficiency
6653(b) [1]
6653(b)(2)
6661
1980
$ 57,895.05
[2] $ 28,947.53
-
-     1981
29,321.64
14,660.82
-
-     1982
51,316.70
25,658.35
*
$ 12,829.18
1983
28,085.05
14,042.53
*
7,021.25
*150 After concessions [3] and taking into account new issues raised by respondent subsequent to the notice of deficiency, we are presented with the following issues for decision: [4] (1) whether respondent is barred from assessing or collecting income tax from petitioner for tax years 1980, 1981 and 1982 because of the statute of limitations; (2) whether petitioner is liable for additions to tax for fraud for tax years 1980 through 1983; (3) whether petitioner failed to include $ 68,782.88, $ 51,785.26, $ 87,135.43 and $ 53,648.67 in gross income for tax years 1980, 1981, 1982 and 1983, respectively; (4) whether petitioner must include $ 15,000 received from William Ragland in gross income for tax year 1980; (5) whether petitioner is liable for self-employment tax pursuant to section 1401(a) for tax years 1980 through 1983; (6) whether petitioner is liable for an addition to tax pursuant to section 6661 for tax years 1982 and 1983; and, as alternatives to the fraud additions, (7) whether petitioner is liable for additions to tax for negligence or intentional disregard of rules and regulations for tax years 1980 through 1983 under section 6653(a); and (8) whether petitioner is liable for *151 an addition to tax pursuant to section 6651(a)(1) for tax years 1981 and 1982. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated by this reference. E. Bonnie Caglia ("Bonnie") resided in Fresno, California, *152 when she filed her petition. She filed her individual Federal income tax returns for tax years 1980, 1981, 1982 and 1983, on April 15, 1981, June 28, 1982, April 27, 1983 and October 9, 1984, respectively. The statutory notice herein was mailed to petitioner on April 15, 1987. Bonnie was employed at Bill's Golden Horseshoe Club ("Club") in Clovis, California, from 1970 until 1984. The Club, which was operated by William E. Ragland, consisted of a card room and a cocktail lounge, where customers gambled amongst themselves at poker games. The Club made money by taking a collection from each person playing at a card table every half-hour. Bonnie was originally hired by Ragland as a floor person who sold chips and cashed out (i.e., paid off) customers. Gradually, she began to assume additional responsibility and eventually was entrusted with opening and managing the Club when Ragland was away. Her duties included opening and closing the Club, ordering supplies, preparing payroll and tax returns, paying salaries, tending bar and all other chores that were necessary to run the Club. Bonnie's salary was $ 18,200 during each of the years in dispute. Customers purchased betting chips *153 from the Club with cash or checks and later redeemed their chips for cash when they finished playing. The redemption of betting chips required a substantial amount of cash, usually in excess of that available at the Club. This cash flow shortage was remedied by cashing customers' checks. Several of Ragland's bank accounts had been closed because his customers' checks occasionally bounced, causing him in turn to overdraw his account when paying Club expenses. This frequent insolvency in the Club's checking accounts prompted the banks to cash checks that Ragland deposited only after they had cleared the customers' banks, which sometimes involved a wait of several weeks. As a convenience to Ragland, Bonnie often took customers' checks to her own bank and either exchanged them for cash or deposited them into her own individual bank account and then cashed a personal check against these funds. Because of her good credit, Bonnie's bank allowed her to immediately draw on the customers' checks that she deposited. She took care to deposit only those checks that were written by customers who had not shown a propensity to bounce checks. George Kodama and Norman Haddad, who were sometime *154 employees of the Club, performed the same check cashing function for Ragland with their personal bank accounts. Bonnie used her personal checking accounts to pay Club operating expenses, such as utilities, salaries, rent and miscellaneous expenses. One elderly Club customer, Vic Murdoch, did not have a checking account. Bonnie accepted cash from Vic and then, as a personal favor, wrote checks from her account to pay his monthly utility bills. Bonnie and Ragland became close friends and frequently travelled together to Nevada to gamble. Although Bonnie sometimes gambled for her own account, she often gambled on behalf of Ragland with his money. This frequently involved Bonnie using Ragland's money to play a particular slot machine that Ragland thought was going to "pay out." Bonnie received a Form 1099 in 1980 that evidenced winnings of $ 7,904 from playing a slot machine on Ragland's behalf. After a particularly successful gambling trip, Ragland gave $ 1,000 of his winnings to Bonnie on April 8, 1980, as a birthday gift. Soon thereafter, Ragland gave her an additional $ 15,000. On her own volition, Bonnie drew up a promissory note in order to treat the $ 15,000 as a loan *155 from Ragland to her, although Ragland made no suggestion that she do this. She deposited a portion of the $ 15,000 in her checking account. Bonnie also received $ 11,635.28 during 1982 in her capacity as a creditor of the Ragland bankruptcy estate, as well as $ 21,039.41 of loan proceeds that she received from Imperial Thrift in 1983. She deposited these amounts in her bank account. Bonnie also received insurance proceeds in 1981 or 1982, after her house was severely burned by fire; however, the amount of the insurance receipts was not established by petitioner. Using the bank deposits method of income reconstruction, respondent reconstructed Bonnie's gross income as follows: 1980
1981
1982
1983
Total Bank
Deposits
$ 127,806.31
$ 76,123.94
$ 133,462.23
$ 99,024.61
Less:
Identified
Sources and
Expenses
59,023.43
24,338.68
46,326.80
66,747.94
Total excess
Deposits
68,782.88
51,785.26
87,135.43
32,276.67
Plus:
Cash Back
-0-  -0-   -0-  21,372.00
TOTAL:
$ 68,782.88
$ 51,785.26
$ 87,135.43
$ 53,648.67
After conceding certain deposits, respondent claims that Bonnie failed to *156 report gross income of $ 83,782.88 ($ 68,782.88 from unexplained excess bank deposits plus $ 15,000 given by Ragland), $ 51,785.26, $ 87,135.43 and $ 53,648.67 for tax years 1980, 1981, 1982 and 1983, respectively. Respondent determined, inter alia, that Bonnie was liable for additions to tax for fraud in connection with the alleged omissions from gross income. Respondent claimed in his answer that Bonnie was Ragland's partner and that the excess bank deposits represented her share of the Club's profits. Bonnie contends, with respect to her income tax returns for tax years 1980, 1981 and 1982, that the three-year statute of limitations expired, barring respondent from assessing taxes for these years. She also claims, regardless of whether the statute of limitations expired, that the excess bank deposits are attributable to customers' checks she cashed for Ragland in order to maintain the Club's cash flow. OPINION Since the statutory notice of deficiency for tax years 1980, 1981 and 1982 was not mailed to petitioner until April 15, 1987, more than three years from the due dates for her income tax returns for these years, it is apparent that assessment and collection of income *157 tax for tax years 1980, 1981 and 1982 is barred by the statute of limitations, section 6501(a), unless the exceptions prescribed in sections 6501(c) or 6501(e) are applicable to the facts of this case. Section 6501(c)(1) provides that "In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time." Section 6501(e)(1) provides that "If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed." In order to determine whether one of these two exceptions operates to toll or extend the running of the normal three-year statute of limitations, it will first be necessary to ascertain whether Bonnie committed fraud or omitted gross income in excess of 25 percent of the gross income she reported on her income tax returns for the years in dispute. *158 Respondent bears the burden of proof with respect to the applicability of the extended six-year statute of limitations Burbage v. Commissioner,82 T.C. 546 (1984), affd. 774 F.2d 644 (4th Cir. 1985). We first address the issue of whether Bonnie fraudulently omitted Club funds from her gross income. Petitioner bears the burden of proving that she did not fail to report gross income. Rule 142(a). Respondent, on the other hand, has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To establish the existence of fraud, respondent must prove by clear and convincing evidence that (1) petitioner underpaid her income tax and (2) some part of the underpayment was due to fraud. Stone v. Commissioner,56 T.C. 213, 220 (1971). Fraud is established by proving that the taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); *159 Gajewski v. Commissioner,67 T.C. 181 (1976), affd. without published opinion, 578 F.2d 1383 (8th Cir. 1978). The existence of fraud is a question of fact that we must resolve upon considering the entire record. Teitelbaum v. Commissioner,294 F.2d 541, 547 (7th Cir. 1961). Fraud is never imputed or presumed, but must be established by independent evidence. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Otsuki v. Commissioner,53 T.C. 96 (1969). However, fraud may be proven by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Spies v. United States,317 U.S. 492, 499 (1943); Rowlee v. Commissioner,80 T.C. at 1123. In the absence of sufficient income tax records, respondent reconstructed Bonnie's gross income by use of the bank deposits method. Bank deposits are prima facie evidence of income and respondent need not prove a likely source of that income. Tokarski v. Commissioner,87 T.C. 74, 77 (1986); *160 Estate of Mason v. Commissioner,64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977). The record in this case does not support respondent's contention that Bonnie omitted Club funds from her gross income. If the only facts we had in this case consisted of respondent's excess bank deposit income reconstruction, we would be compelled to conclude that Bonnie had failed to sustain her burden of proof with respect to the income tax deficiencies. See Diaz v. Commissioner,58 T.C. 560 (1972). However, Bonnie's testimony concerning the excess bank deposits in her checking accounts was convincing and credible. Her boss, Ragland, confirmed that the Club had a severe cash flow problem, which necessitated frequent visits to the bank in order to convert customers' checks into cash. Due to his bad credit, Ragland relied upon Bonnie to cash checks, because her banks permitted her to immediately draw on the checks she brought in. Without a ready supply of cash, the Club could not have redeemed its customers' chips. The testimony of two former Club employees, George Kodama and Norman Haddad, corroborates Bonnie's explanation of the excess *161 bank deposits in her accounts. Kodama and Haddad had also taken customers' checks to be cashed at their respective banks in order to maintain an adequate supply of cash at the Club. Bonnie paid the Club's monthly bills and even helped customer Vic Murdoch pay his monthly bills by writing checks to his creditors. Those activities had the effect of boosting the gross deposits to her accounts. An examination of Bonnie's modest life style does not support respondent's fraud determination. She gambled with moderate frequency, but often with Ragland's money. Her living arrangements and personal expenses did not suggest that she received gross income in excess of $ 18,200, which was her salary at the Club during each of the tax years in dispute. On the basis of the entire record, we conclude that the excess bank deposits do not constitute petitioner's gross income in any disputed year because they were attributable to Bonnie's management of the Club, using Ragland's money, and for his benefit. Diaz v. Commissioner, supra.
The $ 15,000 that Bonnie received from Ragland does not constitute gross income because it is a *162 gift and, as such, is excluded from gross income. Sec. 102(a). Although we note that it is the exceptional payment by an employer to an employee that constitutes a gift, Commissioner v. Duberstein,363 U.S. 278, 287 (1960), it is apparent that Ragland did not give $ 15,000 to Bonnie because of "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit" of an economic nature. Commissioner v. Duberstein,363 U.S. at 285, citing Bogardus v. Commissioner,302 U.S. 34, 41 (1937). A gift results from a detached and disinterested generosity. Commissioner v. LoBue,351 U.S. 243, 246 (1956). A gift arises out of affection, respect, admiration, charity or like impulses. Robertson v. United States,343 U.S. 711, 714 (1952). Ragland was under no moral or legal duty to give money to Bonnie. Bonnie often accompanied Ragland to Nevada on gambling trips; however, she went on these trips because she enjoyed both Ragland's company and the thrill of gambling. Nothing in the record suggests that the $ 15,000 Bonnie received constituted payment for her gambling assistance. There *163 is also no evidence to suggest that Ragland's gift constituted a bonus for her services at the Club. As an employee of the Club, Bonnie received a yearly salary which was not increased during the years in dispute because the Club was financially strapped. The $ 15,000 she received from Ragland was a gift and, consequently, is excluded from gross income. Sec. 102(a). [5] We also hold that Bonnie was gambling on behalf of Ragland when a slot machine she played in 1980, using Ragland's money, paid out $ 7,904. [6] Therefore, Bonnie need not include this amount in gross income; it was Ragland's. We have concluded that Bonnie did not fraudulently omit gross income as determined by respondent's *164 excess bank deposits analysis. We also found that the $ 15,000 she received from Ragland was a gift, in spite of the fact that she treated it as a loan, and that gambling winnings of $ 7,904 in 1980 were not gross income to her. Because respondent has not proven that fraud was involved in any of the years in dispute, we hold that the fraud exception to the statute of limitations does not allow respondent to assess or collect taxes for tax years 1980, 1981 or 1982, under section 6501(c). Respondent has also failed to prove that Bonnie omitted in excess of 25 percent of the gross income she reported on her income tax returns for the tax years in dispute and that the six-year statute of limitations is applicable in the instant case. Sec. 6501(e)(1). Therefore, respondent is barred from assessing or collecting any income tax or addition to tax for tax years 1980, 1981 and 1982. [7]
*165 Respondent mailed the statutory notice of deficiency for tax year 1983 on April 15, 1987 -- within the three-year statute of limitations prescribed by sections 6501(a) and 6501(b)(1). However, we earlier held that Bonnie was not liable for any income tax deficiency in tax year 1983, and we note that the additions to tax for tax year 1983 determined by respondent pursuant to sections 6661(a), 6653(a)(1) and 6653(a)(2) are all premised on a finding that Bonnie underpaid her income tax. Bonnie is not liable for any underpayment of income tax for the tax years in dispute; therefore, we hold that these additions to tax are not applicable in the instant case. The addition to tax pursuant to section 1401(a) for failure to pay self-employment tax is inapplicable because Bonnie was an employee of the Club and was not self-employed. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
2. In his opening brief, respondent lists the sec. 6653(b) addition to tax for 1980 as $ 28,974.53; we can only assume that respondent made a transportation error in his opening brief.↩
*. 50 percent of the interest payable with respect to the portion of the underpayment attributable to fraud. ↩
3. In addition to other concessions, respondent has conceded on brief that petitioner made an overpayment of $ 2,635, which was assessed and paid by petitioner concerning an earlier deficiency notice that respondent issued for tax year 1980. Petitioner did not file a petition with this Court with regard to the first deficiency notice; instead, she filed an Offer in Compromise, which is not the subject of this dispute except to the extent that petitioner is entitled to an overpayment of $ 2,635. The parties also agreed that petitioner is entitled to use income tax averaging for all the years in dispute. ↩
4. Adjustments to petitioner's itemized deductions for medical and dental expenses for tax years 1981 and 1982, and for sales taxes for tax years 1980, 1981, 1982 and 1983, are based upon petitioner's adjusted gross income which, depending upon our decision, may be revised.↩
5. Section 122(b) of Pub. L. 99-514, 100 Stat. 2110, amended section 102 by adding new subsection (c)(1), which applies to prizes and awards granted after December 31, 1986: (c) EMPLOYEE GIFTS. -- (1) IN GENERAL. -- Subsection (a) shall not exclude from gross income any amount transferred by or for an employer to, or for the benefit of, an employee. ↩
6. We need not address Bonnie's contention that respondent erroneously disallowed $ 7,904 in gambling losses because she failed to prove it.↩
7. In her petition, Bonnie claimed that the second statutory notice of deficiency she received for tax year 1980 was invalid because the first statutory notice she received had not been rescinded pursuant to sec. 6212(d); she has failed to prove that the first statutory notice was not properly rescinded. A finding that respondent's second statutory notice of deficiency for tax year 1980 was valid, however, does not change our decision because the statute of limitations for tax year 1980 expired.↩